**Louis Vuitton MALLETIER, Plaintiff,**

v.

**DOONEY & BOURKE, INC., Defendant.**

**No. 04 Civ. 2990(SAS).**

United States District Court, S.D. New York.

Aug. 27, 2004.

418

Theodore C. Max, Kevin N. Ainsworth, Charles A. LeGrand, Mintz Levin Cohn Ferris Glovsky and Popeo P.C., New York, New York, Howard J. Susser, Mintz Levin Cohn Ferris Glovsky and Popeo P.C., Boston, Massachusetts, for Plaintiff.

Douglas D. Broadwater, Roger G. Brooks, David Greenwald, Cravath, Swaine & Moore LLP, New York, New York, Thomas J. McAndrew, Thomas J. McAndrew & Associates, Providence, Rhode Island, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This case involves the Court in the world of haute couture, where Louis Vuitton Malletier ("Louis Vuitton"), armed with state and federal trademark law,[1]

---

1. Specifically, Louis Vuitton alleges trademark infringement and dilution, and unfair competition pursuant to the Lanham Act (the "Act"), 15 U.S.C. §§ 1051 *et seq.*, and New York law. Louis Vuitton asserts claims for: (1) trademark infringement under section 32 of the Act, 15 U.S.C. § 1114; (2) unfair competition and false designation of origin under section 43(a) of the Act, 15 U.S.C. § 1125(a); (3) trademark dilution under the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. § 1125(c); (4) trademark infringement and unfair competition under New York com-

seeks to prevent Dooney & Bourke, Inc. ("Dooney & Bourke")—and all others—from trespassing in what it perceives as its fashion "territory."

The trouble began in October 2002, when Louis Vuitton, an industry leader, premiered a fresh, exciting concept—printing its famous "LV" and geometric shapes in an array of bright, crisp colors on white and black handbags ("Monogram Multicolore" marks). As often happens in the fashion world, this multicolored monogram "look" was instantly and wildly popular. Dooney & Bourke, one of many handbag manufacturers to follow in the trend, launched a line of its own bags featuring its "DB" monogram (without geometric ornamentation) in a multicolored array.

Objecting to its legion of imitators,[2] Louis Vuitton has sued Dooney & Bouke, seeking refuge under both federal and state law governing intellectual property rights. The problem is that Dooney & Bourke did not use Louis Vuitton's logo (an intertwined "LV") or famous Toile Monogram on its bags. Rather, Dooney & Bourke used a multicolored "DB" monogram on both a white and black background. This emulation of the certain features of the Louis Vuitton bags, however, does not reflect Dooney & Bourke's intention to deceive customers into concluding that the product derives from Louis Vuitton.[3]

■ Louis Vuitton created a new look and now seeks to preclude others from following its lead. If Louis Vuitton succeeds, then it will have used the law to achieve an unwarranted anticompetitive result. It is well established that the objective of trademark law is *not* to harm competition. To the contrary, the Supreme Court has noted that trademark law "seeks to promote competition by protecting a firm's reputation" but does not permit legitimate competition to be inhibited by "allowing a producer to control a useful product feature."[4] Put another way, "[a] trademark is not a property right, but an identifier; so, provided no one is likely to be confused by the alleged infringer, there is no impairment of the interest that the trademark statute protects."[5] Distilling the voluminous submissions to their essence, it is quite clear that Louis Vuitton cannot prevail on its plea for injunctive relief. To hold otherwise would not only contravene settled law, it would grant

mon law; and (5) trademark dilution and injury to business reputation under section 360-l of New York General Business Law. *See* Complaint ("Compl.") ¶ 1. Louis Vuitton now moves to preliminarily enjoin Dooney & Bourke from, *inter alia*, "using in any way any of the Louis Vuitton Trademarks, including the Louis Vuitton Toile Monogram Multicolore Trademarks, [or] any designation or design so similar as to be likely to cause confusion, mistake or deception with, or to dilute in any way, the Louis Vuitton Trademarks." Compl. ¶ 108; *see also* 4/30/04 Notice of Louis Vuitton's Motion for a Preliminary Injunction.

2. Indeed, Louis Vuitton has sued approximately twenty companies in the past year, claiming alleged infringement of its Monogram Multicolore marks, and maintains a "list" of "infringers," presumably in anticipation of future litigation. *See* Transcript of Preliminary Injunction Hearing ("Tr.") at 139 (Emmanuel Barbault, Director of Anticounterfeiting for the Americas for Louis Vuitton) (estimating number of companies sued); *id.* at 158–62 (indicating those companies on his "list").

3. *See Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 745 (2d Cir.1998).

4. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

5. *Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1361 (7th Cir.1995). At the same time, anti-dilution laws protect the rights of senior users from the deleterious whittling away of the distinctiveness of their marks by junior users, usually in non-competitive markets.

Louis Vuitton monopoly rights over a "look"—a multicolored monogram against a white or black background.[6] In connection with this motion, the parties have collectively submitted close to 20,000 pages of material. But no amount of expert opinion, legal analysis, or demonstrative evidence can overcome the clarity that comes from direct observation. The following pictures of the competing products demonstrate the point.[7]

---

6. There is no proof whatsoever that anyone believes that all colorful, monogrammed bags emanate from Louis Vuitton. *See infra* Part III.B.2.d. Similarly, Louis Vuitton has not shown that Dooney & Bourke has effectively diminished the strength of Louis Vuitton's Monogram Multicolore marks as source identifiers. *See infra* Part III.C.

7. The following pages depict: (1) Louis Vuitton's Alma Bag (white), Defendant's Exhibit ("Def.Ex.") 807, and Dooney & Bourke's Small Doctor's Satchel (white), Def. Ex. 1268, and (2) Louis Vuitton's Multicolore Pochette (black), Plaintiff's Exhibit ("Pl.Ex.") 11, and Dooney & Bourke's Medium Bucket Satchel (black), Def. Ex. 1266. These photos are presented to provide a comparison of the colored patterns used on a solid background, *not* for the differences in other features such as the zippers, buckles, or other stylistic components of the bags.

## I. BACKGROUND [8]

**A. The Parties**

8. The facts in this section, together with the legal conclusions and facts set forth in the

Louis Vuitton, which has its principal place of business in Paris, France, manufactures, imports, sells, and distributes high fashion apparel, designer luggage, handbags, and leather accessories throughout the world, including New York. Dooney & Bourke makes and sells quality handbags and other fashion accessories, and maintains its principal place of business in Connecticut.[9]

## B. Facts

### 1. Genesis of the Louis Vuitton Monogram Multicolore Marks

Louis Vuitton owns various trademarks, including three that protect the individual elements of its celebrated "Toile Monogram."[10] Created in 1896, the Toile Monogram features "entwined LV initials with three motifs—a curved diamond with a four-point star inset, its negative, and a circle with a four-leafed flower inset."[11] These elements appear on apparel and accessories sold worldwide in "Louis Vuitton freestanding boutiques and in-store boutiques in the finest department stores, including Saks Fifth Avenue, Bloomingdale's, Nieman Marcus, and Macy's."[12] The Toile Monogram is traditionally printed in gold against a dark chestnut background.[13]

In 1997, Louis Vuitton hired fashion designer Marc Jacobs, who now serves as the "Artistic Director for its Louis Vuitton fashion apparel and accessory design lines, as well as his own signature lines."[14] In 2002, Jacobs contacted Japanese artist Takashi Murakami to collaborate in the "revitalization" for the new millennium of the traditional Louis Vuitton monogram.[15] To that end, on July 16, 2002, Murakami, Ja-

---

sections that follow, see infra Parts II and III, constitute the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a).

9. See Compl. ¶¶ 5–6.

10. See U.S. Registration Nos. 2,177,828 (Aug. 4, 1998) (curved diamond with four-point star inset); 2,181,753 (registration date of Aug. 18, 1998) (circle with four-leafed flower inset); 2,773,107 (Oct. 14, 2003) (negative of curved diamond with four-point star inset).
 The trademark registrations covering the use of the Toile Monogram on handbags are: U.S. Registration Nos. 0,297,594 (Sept. 20, 1932) (luggage, pocketbooks, satchels, and hat/shoe boxes); 1,643,625 (May 7, 1991) (leather and imitation leather products, including traveling, hand, and shoulder bags used for luggage); 1,653,663 (Aug. 13, 1991) (same). The trademarks used in connection with other items include: U.S. Registration Nos. 1,770,131 (May 11, 1993) (clothing for men and women, footwear, shawls, sashes, and scarves); 2,399,161 (Oct. 31, 2000) (clothing, neckties, boots and sandals, hats, caps, etc.).

11. Compl. ¶ 8.

12. Id. ¶ 11.

13. See, e.g., Louis Vuitton Papillon Bag (Brown & Gold), Pl.Ex. 8(bag); Pl.Ex. 8A (photograph). Indeed, Louis Vuitton has "claimed" the

> yellow color used for the floral decoration and the letters and the deep chestnut color of the background of the fabric which comprises part of the mark. The flower design and the letters "LV" appear in the color yellow and the color yellow is claimed as a feature of the mark as is the dark brown which forms the ground on which the letters and flower design appear.

U.S. Registration No. 1,653,663; see also U.S. Registration No. 0,297,594.

14. Compl. ¶ 15; see also Tr. at 407 (Jacobs).

15. See Tr. at 454 (Jacobs); see also id. at 454 (discussing the creation of the "new monogram in the next millennium"); id. at 409 (Jacobs) ("[T]here were many reasons [that I wanted to collaborate with Mr. Murakami], but I initially thought that I would like to invite him as a contemporary Japanese artist, to revisit and redo this Louis Vuitton monogram toile, or canvas, monogram canvas."); id. at 413–14 (noting that, by collaborating with Murakami, the intention was to create a "lasting thing," which was the "multicolored monogram that [Murakami] created"); id. at 419 ("We decided within our meetings what it would be, that it would be the monogram, and we would be creating a new monogram.

cobs, and other Louis Vuitton and Kaikai Kiki, LLC (Murakami's New York-based company) employees met at Louis Vuitton's Paris offices.[16] The resulting relationship resulted in the creation of four handbag and accessory collections premised on the Toile Monogram Trademarks:

[ (1) ] the Monogram Cherry Blossom, featuring a pattern of the Louis Vuitton Toile Monogram with cherry blossoms; [ (2) ] the Eye Love Monogram, featuring a colorful pattern of the Louis Vuitton Toile Monogram with a Murakami eye symbol; [ (3) ] the Monogram Multicolore, offering a visionary and avant-garde version of the [Toile Monogram] in thirty-three colors; and [ (4) ] a collection of Murakami characters featured on the Louis Vuitton Toile Monogram pattern.[17]

These patterns are printed through a process of silk-screening onto the treated canvases of handbags with "straps and handles made out of natural calf's hide leather and hand-applied colored trim ... finished with [yellow] double-stitched edging and shiny gold hardware."[18] Thirty-three "very specific" colors, selected by Murakami from his palette, are used in connection with the Monogram Multicolore marks.[19] In particular, the Monogram Multicolore marks depict the traditional interlocked initials "LV" and geometric shapes presented in a repeating pattern; however, the Toile Monogram is not printed in gold against chestnut, but in a panoply of bright colors set against a white or black background.[20] The Eye Love Monogram differs from the Monogram Multicolore in that the "circle flower" has been replaced by a signature Murakami "jelly fish eye."[21]

The Murakami bags were launched on October 7, 2002 at Louis Vuitton's Spring 2003 fashion show in Paris, France.[22]

---

I referred to it in the deposition as this monogram for the next millennium ...."); *id.* at 473 (Jacobs) ("I think that we created a young and fresh exciting ... new Louis Vuitton Monogram ...."); *id.* at 174, 198 (Nathalie Moulle–Berteaux, Louis Vuitton's Intellectual Property Director) (asserting that the purpose of the collaboration with Murakami was not to create a limited edition product, but to reinterpret Louis Vuitton's main trademarks).

16. *See id.* at 171 (Moulle–Berteaux) ("The purpose of the meeting was to first explain to [Murakami] and his team who we were, Louis Vuitton, its history, it's [sic] values[,] its main trademarks, and also to fix the outline of our collaboration with him."); *see also* 7/27/04 Declaration of Moulle–Berteaux in Support of Plaintiff's Motion for Preliminary Injunction, Pl.Ex. 5, ¶ 4. This agreement was later formalized in a written contract. *See* 12/18/02 Transfer and License Agreement on Intellectual Property Rights, Pl.Ex. 4.

17. Compl. ¶ 16. Only the "Monogram Multicolore" and the "Eye Love Monogram" marks are at issue in this action. Louis Vuitton has not registered these new trademarks. *See infra* note 118.

18. Compl. ¶ 17; *see also* Affidavit of Barbault ("Barbault Aff."), in Support of Plaintiff's Motion for a Preliminary Injunction, Pl.Ex. 1, ¶ 17; Tr. at 180–95 (Moulle–Berteaux) (describing the contract negotiations memorialized in an agreement between Louis Vuitton and Murakami and Kaikai Kiki, LLC).

19. Tr. at 85 (Barbault) (noting that the thirty-three colors are "unusual" and "very specific colors, coming from Mr. Murakami's special palet [sic]"); *id.* at 455–56 (Jacobs) (noting that the colors are Murakami's and that he [Jacobs] "associate[s] them with [Murakami]").

20. *See, e.g.,* White Louis Vuitton Monogram Multicolore Swatch, Pl.Ex. 2; Black Louis Vuitton Monogram Multicolore Swatch, Pl. Ex. 3.

21. Tr. at 420 (Jacobs); *see also, e.g.,* Eye Dare You Bag (Photograph), Pl.Ex. 30.

22. *See* Compl. ¶ 18; *see also* Tr. at 424 (Jacobs); *id.* at 486–87 (Heather Vandenberghe, Vice–President of Marketing and Communication for Louis Vuitton); Louis Vuitton Women's Collection Spring/Summer 2003 Fashion Show (DVD), Pl.Ex. 20.

These handbags, which were first distributed to retail stores in March 2003 (with a white background), met with "overwhelmingly favorable response," [23] and according to Louis Vuitton were dubbed by the media as one of the "must have" or "it" bags of the season.[24] Consumers, including celebrities such as Janet Jackson, Elton John, and Reese Witherspoon, instantly expressed interest in purchasing a bag.[25] In July 2003, Louis Vuitton offered the Monogram Multicolore bags in black.[26] When the Complaint was filed, nearly 70,000 Monogram Multicolore handbags and accessories (over $40 million) had been sold in the United States, of which approximately $25 million was attributable to the white bags and $16 million to the black

bags.[27] These bags range in price from an estimated $360 to $3,950.[28]

## 2. Genesis of the Dooney & Bourke It–Bags

Dooney & Bourke, a company that has been in the handbag business since 1975, has sold bags bearing a repeated pattern of its interlocking initials ("DB") from 2001, when it launched its "Signature" and "Mini Signature" lines.[29] This "DB" monogram is a registered trademark that is not limited to a particular color.[30] In conjunction with *Teen Vogue*, Peter Dooney began working with a team of girls selected by the magazine—dubbed the "It Team"—to create Dooney & Bourke handbags with appeal to teenagers.[31] To that

23. Compl. ¶ 19. A market for counterfeit Louis Vuitton bags immediately emerged. *See* Tr. at 137–38 (Barbault) ("It was an unprecedented counterfeiting activity in the Louis Vuitton history.... [T]hat product was famous a day after the show. A day after the show everybody wanted to copy them, and we had counterfeit industry before we launched them.").

24. *See* Compl. ¶¶ 21–46. Jacobs notes that, in his twenty years of experience in the fashion industry, the response to the bags was "unprecedented." Tr. at 425; *see also id.* at 424 (Jacobs); *id.* at 426 ("[I]n my experience, the reaction was really amazing.... [This bag] made an impact even outside of fashion, which, you know, I can't say that about any other bag I have ever had anything to do with."); *id.* at 490 (Vandenberghe) (describing the "excitement" generated by the bags); *id.* at 112 (Barbault) (noting that in his ten years of experience in the fashion industry the press response to the bags was "really incredible"); *see also, e.g.,* Press Books I–III (containing articles relating to the Monogram Multicolore marks), Pl. Exs. 21–23. The parties agree that the newspapers and other periodicals in which these articles appeared reach millions of people. 8/23/04 Telephone Conference.

25. *See* Tr. at 491 (Vandenberghe). People immediately placed orders and signed up on

waiting lists for the handbags featuring the Monogram Multicolore marks. *See id.*

26. *See* Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction ("Pl.Mem.") at 1; *see also* Barbault Aff. ¶ 55.

27. *See* Compl. ¶ 34; *see also* Barbault Aff. ¶ 49.

28. *See* Barbault Aff. ¶ 50.

29. *See* Tr. at 640 (Peter Dooney, President and Chief Designer for Dooney & Bourke); *id.* at 646 (Dooney); *see also, e.g.,* Dooney & Bourke Mini Signature Tassel Tote (red), Def. Ex. 809; Dooney & Bourke Mini Signature Short Shoulder Sac (yellow), Def. Ex. 1271; Dooney & Bourke Mini Signature Small Bucket Satchel (yellow), Def. Ex. 1260; Dooney & Bourke Mini Signature Short Shoulder Sac (blue), Def. Ex. 1261, Dooney & Bourke Mini Signature Medium Top Zip (aubergine), Def. Ex. 1269.

30. *See* Tr. at 649 (Dooney).

31. *See id.* at 669 (Dooney). Dooney & Bourke and Teen Vogue first considered collaborating in the fall of 2002. *See id.* Dooney first met with the It Team a few days before the trip to Milan. *See* 6/28/04 Deposition of Christina Caruso, Nonparty Witness (member of the It Team) at 39–40.

end, Dooney and the It Team traveled to Milan in March 2003, where they were photographed peering into a store window featuring a Monogram Multicolore display in white, and viewing a black Monogram Multicolore swatch in a factory.[32] Dooney testified that seeing the Monogram Multicolore served to "reinforce" his "thinking" that "white and these happy colors, confetti looks and so forth were . . . were moving forward and people liked them."[33]

In late July 2003, Dooney & Bourke introduced its "It–Bag" collection, featuring the "DB" monogram (used in the Signature Line) in bright colors against a white background.[34] In October 2003, Dooney & Bourke began selling these handbags in black.[35] The It–Bags display interlocked initials "D" and "B," printed in a forward and reverse pattern in an appreciably smaller font size than used on the Louis Vuitton bags. The "D" and "B" of each monogram are printed in different colors.[36] Like the Louis Vuitton Murakami bags, the It–Bags have "leather straps or handles and/or single-colored leather borders and shiny gold metal hardware."[37] But, in contrast to the Murakami bags, those made by Dooney & Bourke have multicolor zippers; a variety of colored backgrounds (*e.g.*, periwinkle, grape, and bubble gum in addition to black and white); and a pink enameled heart with the words "Dooney & Bourke" written in gold script hanging by a leather strap from each Dooney & Bourke It–Bag.[38] The It–Bag Collection is Dooney & Bourke's largest revenue source, presently comprising nearly half of its total sales.[39]

---

**32.** *See* Pl.Ex. 45 (photograph of Dooney and It Team looking into the Louis Vuitton store window); Photograph of It Team Viewing Canvases, D & B 00003618, Ex. L to the Affidavit of Charles LeGrand ("LeGrand Aff."), Louis Vuitton's counsel, in Further Support of Plaintiff's Motion for a Preliminary Injunction. In his deposition, Dooney first stated that he "was not present at the time" when the black Monogram Multicolore canvas was exhibited to the It Team, testifying, "I may have gone to the bathroom at one point or whatever else. What I'm telling you is I did not see this." 6/22/04 Deposition of Peter Dooney ("Dooney Dep.") at 258. He further testified that he was unaware of Louis Vuitton's Monogram Multicolore marks until Spring 2003, when he saw the store window. *See id.* at 146–47. However, Dooney's story changed by the time he testified at the hearing. *See* Tr. at 675 ("By the time I went to Italy, absolutely I had seen their bags.").

**33.** Tr. at 676.

**34.** *See id.* at 720.

**35.** *See* Monthly Sales of "It" products (in units) by Color, Def. Ex. 204.

**36.** *See, e.g.,* Dooney & Bourke Catalogue (Spring 2004), Def. Ex. 540, at 20–23; *see also* Dooney & Bourke It–Bag (White), Def. Ex. 1204; Dooney & Bourke It Tassel Tote (Black), Def. Ex. 1256.

**37.** Compl. ¶ 50. The Dooney & Bourke bags do not, however, have metal studs. *See, e.g.,* Dooney & Bourke It–Bag (White); Dooney & Bourke It Tassel Tote (Black).

**38.** *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Def.Opp.") at 6; *see also* It–Bag Swatches in Various Colors, Def. Ex. 121; Dooney & Bourke It Tassel Tote (periwinkle), Def. Ex. 1253; Dooney & Bourke It Tassel Tote (bubble gum), Def. Ex. 1257; Dooney & Bourke It Bucket Bag (white), Pl. Ex. 12 (displaying multicolored zipper); Dooney & Bourke Catalogue (Spring 2004) at 20–23; Percentage of IT Collection Revenues by Color (April 2004), Def. Ex. 209 (depicting percentage breakdown of April 2004 It Collection revenue for the white (43.0%), black (23.4%), bubblegum (19.1%), and other colored (14.5%) bags).

**39.** *See* Spreadsheet: Monthly Sales (in dollars) by Product Line, Def. Ex. 200, Bar Chart: Percentage of Total Sales Attributable to Sales of It Collection, Def. Ex. 212; *see also* Tr. at 801–02 (Kinsley) (explaining Def. Ex. 212). Revenues from the white or black It–Bags alone account for 30% of Dooney & Bourke's total revenues. *See* Spreadsheet: Monthly Sales (in dollars) by Product Line;

According to Barbault, Louis Vuitton first became aware of Dooney & Bourke's intention to release the It–Bag line in approximately July of 2003, but "was unable to inspect or obtain one of the handbags until ... months after they were first offered for sale." [40] Louis Vuitton then contacted counsel and hired an expert to test for consumer confusion. On April 16, 2004, nearly nine months after the It–Bags entered the market, Louis Vuitton sent a cease and desist letter to Dooney & Bourke and initiated the instant action three days later.[41] Approximately two weeks later, Louis Vuitton moved for immediate injunctive relief. The motion was fully briefed on July 29, 2004, and a hearing was held on July 30, August 2, 5, 6, 9–11, 2004. The evidentiary record in this case closed on August 23, 2004.

## II. APPLICABLE LAW

### A. Legal Standard

■ A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies" [42] and should not be routinely granted.[43] To obtain a preliminary injunction, a party must demonstrate (1) probability of irreparable harm in the absence of injunctive relief and (2) either (A) a likelihood of success on the merits of the claim, or (B) "sufficiently serious questions going to the merits to make them a fair

ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." [44] "The party seeking the injunction must show a 'clear' or 'substantial' likelihood of success where the injunction sought is mandatory—i.e., it will alter, rather than maintain, the status quo." [45]

### 1. Preliminary Injunctions in the Infringement Context

■ "In an action for trademark infringement, where a mark merits protection, a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." [46] Thus, the central questions before the court are (1) whether the plaintiff has a valid mark entitled to protection and (2) whether the defendant's alleged infringement is likely to cause confusion among consumers.[47]

### 2. Preliminary Injunctions in the Dilution Context

■ The fact that a plaintiff may ultimately prevail on her dilution claim, entitling her to a permanent injunction, "does not mean that [she is] presumptively entitled to a preliminary injunction." [48] As the Second Circuit has noted:

Monthly Sales (in dollars) of It Products by Color, Def. Ex. 205.

**40.** Barbault Aff. ¶ 54; *see also* Tr. at 134 (Barbault).

**41.** *See* Tr. at 134–35 (Barbault).

**42.** *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985).

**43.** *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

**44.** *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir.2004) (quotation marks and citation omitted).

**45.** *Id.*

**46.** *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir.2003); *accord Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 129 (2d Cir.2004). In other words, "proof of a likelihood of confusion [ ] create[s] a presumption of irreparable harm, and thus a plaintiff would not need to prove such harm independently." *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir.2000).

**47.** *See Brennan's*, 360 F.3d at 129.

**48.** *Federal Express*, 201 F.3d at 178.

Though the legislatures have concluded that the gradual erosion of a famous or distinctive mark is to be prevented, the district court, before exercising its extraordinary equity powers to grant a preliminary injunction, should consider the likely pace of such an erosion pending adjudication of the merits. Some likely successful dilution claims will warrant such preliminary relief, while others will not.[49]

## B. Trademark Infringement and Unfair Competition Under the Act

■ The Supreme Court has explained the objectives of the Lanham Act, noting that it:

"does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." ... Federal trademark law "has no necessary relation to invention or discovery," but rather, by preventing competitors from copying "a source-identifying mark," "reduce[s] the customer's costs of shopping and making purchasing decisions," and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product."[50]

Section 43(a) of the Act permits a cause of action for the unauthorized use of unregistered trademarks and trade dress.[51] Specifically, this section creates liability against any person who:

in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion ... or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.... [52]

Accordingly, "[w]here there is a claim of consumer confusion [as] to the association of a product or service with another person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question."[53]

### 1. Validity of the Mark

■ "To be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others."[54] For purposes of trademark protection, marks are classified in five categories.

A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it

---

**49.** *Id.*

**50.** *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 29, 34, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 34, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) and *In re Trade–Mark Cases,* 100 U.S. 82, 94, 10 Otto 82, 25 L.Ed. 550 (1879)) (alteration in original).

**51.** *See generally Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

**52.** 15 U.S.C. § 1125(a).

**53.** *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 155 (2d Cir.2002) (quoting *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 61–62 (2d Cir. 2000)).

**54.** *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir.1999).

describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.[55]

"A mark is entitled to protection when it is inherently distinctive," that is, arbitrary, fanciful, or suggestive.[56] On the other hand, if the mark is "merely descriptive,' [ ] it qualifies for protection only if it has acquired secondary meaning...."[57] In other words:

[A] mark can be distinctive in one of two ways. First, a mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source." ... Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."[58]

Classification of a mark requires the factfinder to determine "how the purchasing public views the mark."[59]

## 2. Likelihood of Confusion

▮▮▮▮ Likelihood of confusion is the keystone of trademark infringement. To determine whether there is "a likelihood of confusion," this Circuit applies the multifactor test set forth long ago in *Polaroid Corp. v. Polarad Electronics Corp.*[60] "No

---

**55.** *Id.*

**56.** *Id.*

**57.** *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir.1999) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995)). I note that the use of the phrase "secondary meaning" in this context is somewhat misleading. The Supreme Court has explained that:

 The phrase "secondary meaning" originally arose in the context of word marks, where it served to distinguish the source-identifying meaning from the ordinary, or "primary" meaning of the word. "Secondary meaning" has since come to refer to the acquired, source-identifying meaning of a nonword mark as well. It is often a misnomer in that context, since nonword marks ordinarily have no "primary" meaning. Clarity might well be served by using the term "acquired meaning" in both the word-mark and the nonword-mark contexts....

*Wal–Mart Stores*, 529 U.S. at 211, n. *, 120 S.Ct. 1339. Secondary meaning is assessed rigorously in light of "advertising expenditures, consumer studies, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and length and exclusivity of use." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 169 (2d Cir.1991).

**58.** *Wal–Mart Stores*, 529 U.S. at 210–11, 120 S.Ct. 1339 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) and *Inwood Labs., Inc. v. Ives Labs.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Notably, where the "mark" at issue is color *alone*, the Supreme Court has "held that [it can] be protected as a trademark, but only upon a showing of secondary meaning." *Id.* at 212, 120 S.Ct. 1339 (citing *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)). That is, "[b]ecause a color, like a 'descriptive' word mark, [can] eventually 'come to indicate a product's origin,'... it [can] be protected *upon a showing of secondary meaning." Id.* (emphasis in original).

**59.** *Lane Capital*, 192 F.3d at 344.

**60.** 287 F.2d 492 (2d Cir.1961). The Seventh Circuit has observed that "[t]he legal standard [for confusion] under the Act has been formulated variously, but the various formulations come down to whether it is likely that the challenged mark if permitted to be used by the defendant would cause the plaintiff to lose a substantial number of consumers." *Indianapolis Colts, Inc. v. Metropolitan Balt. Football Club Ltd. P'ship*, 34 F.3d 410, 414 (7th Cir.1994).

single factor is dispositive, nor is a court limited to consideration of only these factors." [61] Although application of the *Polaroid* test is not "rigid, it is nevertheless 'incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why.' " [62] However, the *Polaroid* factors are "merely tools 'designed to help grapple with the "vexing" problem of resolving the likelihood of confusion issue,' and [ ] 'the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula.' " [63]

### a. Factor 1: Strength of Plaintiff's Marks

"The strength of a trademark encompasses two different concepts, both of which relate significantly to likelihood of consumer confusion." [64] The first is the trademark's inherent strength, or "inherent distinctiveness"; the second is its "acquired distinctiveness," or the "fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." [65]

As to the first measure of strength— inherent distinctiveness—the law provides "broad, muscular protection" to arbitrary or fanciful marks and "lesser protection, or no protection at all to marks consisting of words that identify or describe the goods or their attributes." [66] The second measure of strength, that of source identification, is assessed by "the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." [67] Acquired distinctiveness generally relates to the fame of a mark that has been prominently used in connec-

---

It should be noted that there are several variations on consumer confusion actionable under the Act: (1) initial interest, (2) point-of-sale, and (3) post-sale confusion. *See Empresa Cubana del Tabaca v. Culbro Corp.*, No. 97 Civ. 8399, 2004 WL 602295, at *33 (S.D.N.Y. Mar.26, 2004). "Initial interest confusion occurs when 'potential customers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase.' " *Id.* at *49 (quoting *Jordache Enters. v. Levi Strauss & Co.*, 841 F.Supp. 506, 514–15 (S.D.N.Y. 1993)). "Post-sale confusion [can occur] after a product has been purchased and put into use, and [ ] 'a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product.' " *Id.* (quoting *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir.2000)). Confusion is also characterized as either "forward" or "reverse." The former is the "traditional form of confusion in which the junior user uses the mark to sell goods or services based on the misperception that they originate with the senior user." *Brockmeyer v. Hearst Corp.*, No. 01 Civ. 7746, 2002 WL 1402320, at *7 (S.D.N.Y. June 27, 2002). By contrast, "[r]everse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Id.*

**61.** *Brennan's*, 360 F.3d at 130.

**62.** *New Kayak Pool v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir.2001) (quoting *Arrow Fastener*, 59 F.3d at 400).

**63.** *Bristol–Myers Squibb. Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.1992) (quoting *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986)).

**64.** *Virgin Enters.*, 335 F.3d at 147.

**65.** *Id.; accord Brennan's*, 360 F.3d at 130.

**66.** *Virgin Enters.*, 335 F.3d at 147. "In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning." *Time*, 173 F.3d at 117.

**67.** *Virgin Enters.*, 335 F.3d at 147.

tion with a particular area of commerce for a long time.

### b. Factor 2: Similarity of the Marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark." [68] "When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused." [69] "The fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." [70] In evaluating this factor, a court must consider "all factors that could reasonably be expected to be perceived by and remembered by potential purchasers ... [including the] context in which the respective marks are generally presented." [71] The "prominent use" of a well known brand name on the product "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." [72]

### c. Factor 3: Proximity of the Products and Factor 4: Likelihood the Plaintiff Will "Bridge the Gap"

These factors relate to the competitive distance between the products. [73] The Second Circuit has stated that "the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." [74] "In examining [the proximity] factor a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others." [75]

The "proximity inquiry" requires a court to consider the "extent [to which] the two products compete with each other." [76] This factor has two elements: (1) market (relating to whether two products are in related areas of commerce) and (2) geographic (regarding the geographic separation of the products) proximity. [77] "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." [78]

"Bridging the gap" involves "a determination of the likelihood that the plaintiff will enter the [defendant's] business or of the average customer's perception that the plaintiff would enter the [defendant's] market." [79] Here, both parties are in the business of selling handbags. Accordingly, this factor is not an issue.

### d. Factor 5: Existence of Actual Confusion

"It is self-evident that the existence of actual consumer confusion indi-

**68.** *Brennan's,* 360 F.3d at 133.

**69.** *Virgin Enters.,* 335 F.3d at 149; *see also Arrow Fastener,* 59 F.3d at 394; *Bristol–Myers Squibb,* 973 F.2d at 1046.

**70.** *Brennan's,* 360 F.3d at 133.

**71.** *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133 (2d Cir.1979), *abrogated on other grounds, Bristol–Myers Squibb,* 973 F.2d at 1033.

**72.** *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000).

**73.** *See Arrow Fastener,* 59 F.3d at 396.

**74.** *Virgin Enters.,* 335 F.3d at 150.

**75.** *Brockmeyer,* 2002 WL 1402320, at *10.

**76.** *Brennan's,* 360 F.3d at 134.

**77.** *See id.*

**78.** *Id.*

**79.** *Brockmeyer v. Hearst Corp.,* 248 F.Supp.2d 281, 297 (S.D.N.Y.2003).

cates a likelihood of consumer confusion."[80] It is, however, well established that a plaintiff seeking to prevail under the Lanham Act need not prove the existence of *actual* confusion, "since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."[81]

Plaintiffs commonly use consumer surveys to demonstrate the existence of consumer confusion.[82] Obviously, "[s]urveys do not measure the degree of *actual* confusion by real consumers making mistaken purchases. Rather surveys create an experimental environment from which we can get useful data from which to make informed inferences about the likelihood that actual confusion will take place."[83]

▆▆▆▆ "The evidentiary value of a consumer survey's results depends upon the underlying objectivity of the survey itself, which is determined by reference to [a number of factors]."[84] These criteria include whether:

> [(1)] the proper universe was examined and the representative sample was drawn from that universe; [(2)] the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; [(3)] the questions were leading or suggestive; [(4)] the data gathered were accurately reported; and [(5)] persons conducting the survey were recognized experts.[85]

Reliance on expert studies is not without its hazards. Indeed, the leading commentator in this field has stated that "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions. . . . It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another."[86] Practically speaking, there is

---

80. *Virgin Enters.*, 335 F.3d at 151.

81. *Lois Sportswear*, 799 F.2d at 875.

82. Surveys are also commonly used in trademark cases to show that a mark has either attained secondary meaning or been actually diluted. *See* J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition, § 32:158, at 32–250.4–32–250.6 (Supp.6/2004); *see also Indianapolis Colts*, 34 F.3d at 414 ("To help judges strike the balance, the parties to trademark disputes frequently . . . hire professionals in marketing or applied statistics to conduct surveys of customers."). Interestingly, a recent "study of reported trademark infringement cases that went to final judgment, including applications for interim injunctions, during the last ten years reveals that survey evidence . . . is before the court around 57.4 percent of the time. Of that 57.4 percent, however, survey evidence is discounted or accorded little weight in around 22.2 percent of cases." Graeme W. Austin, *Trademarks and the Burdened Imagination*, 69 Brook. L.Rev. 827, 867 (2004).

 The standards discussed in this section are applicable to all of the surveys presented by the parties in connection with the instant motion.

83. 5 McCarthy, *supra* note 82, § 32:184, at 32–308 (Supp.6/2004) (emphasis added). As McCarthy notes, "[d]irect evidence of actual confusion can come only from such sources as misdirected phone calls or letters or even from that rarest of evidence, the testimony of someone willing to testify that they were once a confused customer." *Id.* Although survey evidence is not direct evidence of actual confusion, it is nonetheless routinely categorized under the heading "actual confusion." *See id.* at 32–309.

84. *1–800 Contacts, Inc. v. WhenU.com*, 309 F.Supp.2d 467, 499 (S.D.N.Y.2003).

85. *Id.* Similarly, the 1995 Version of the Manual for Complex Litigation enumerates seven factors. *See* 5 McCarthy, *supra* note 82, § 32:181, at 32–303 (Supp.6/2004) (listing factors); *see also* Reference Manual on Scientific Evidence 236–72 (Federal Judicial Center 2000) (expanding on these criteria).

86. 5 McCarthy, *supra* note 82, § 32:178, at 32–296.

"no such thing as a 'perfect' survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one."[87] As the Seventh Circuit has noted:

> Many experts are willing for a generous (and sometimes for a modest) fee to bend their science in the direction from which their fee is coming. The constraints that the market in consultant services for lawyers places on this sort of behavior are weak.... The judicial constraints on tendentious expert testimony are inherently weak because judges ... lack training or experience in the relevant fields of expert knowledge. But that is the system we have.[88]

### e. Factor 6: Sophistication of Consumers

The Second Circuit has noted that:

Because likelihood of confusion "must be assessed by examining the level of sophistication of the relevant purchasers" of the plaintiff's and defendant's services, "[courts] must consider [t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."[89]

"This ... factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers."[90]

### f. Factor 7: Bad Faith and Factor 8: Quality of the Defendant's Products

These factors are not of "high relevance to the issue of likelihood of confusion. A finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close."[91] Bad faith "examines whether defendants 'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and [plaintiff's] product.'"[92] Quality of the defendant's products is "primarily concerned with whether the inferior quality of a junior user's goods could jeopardize the senior user's reputation. However, '[p]roducts of equal quality may [also] create confusion as to source.'"[93]

### C. Trademark Dilution

 Under the FTDA, "the owner of a famous trademark [can] seek 'an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become

87. *Id.* at 32–297.

88. *Indianapolis Colts*, 34 F.3d at 415.

89. *Sports Auth. Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir.1996) (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir.1993)); *see also Streetwise Maps*, 159 F.3d at 746.

90. *Arrow Fastener*, 59 F.3d at 398.

91. *Virgin Enters.*, 335 F.3d at 151–52; *see also TCPIP Holding Co. v. Haar Communications*, 244 F.3d 88, 102 (2d Cir.2001) ("Bad faith on the part of a party can influence the court in at least two ways. First, where a substantive issue such as irreparable harm or likelihood of confusion is a close question that could reasonably be called either way, a par-

ty's bad faith could cause it to lose the benefit of the doubt. Second, if prospective entitlement to relief has been established, the good or bad faith with which the parties had conducted themselves could influence the court in the fashioning of appropriate equitable relief, or even cause it to deny equitable relief to a party that had conducted itself without clean hands.").

92. *Streetwise Maps*, 159 F.3d at 745 (quoting *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991)).

93. *Savin Corp. v. Savin Group*, No. 02 Civ. 9377, 2003 WL 22451731, at *11 (S.D.N.Y. Oct.24, 2003) (quoting *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 142 (2d Cir.1999)) (citation omitted).

famous and causes dilution of the distinctive quality of the mark.'"[94] Whereas an action for trademark infringement "serves the interests of consumers, as well as sellers, in having trademarks function as source-identifiers," a dilution claim exists *"solely* for the benefit of sellers. Its purpose is to protect the owners of famous marks from the kind of dilution that is permitted by the trademark laws when a junior user uses the same mark in a non-confusing way in an unrelated area of commerce."[95] Dilution ordinarily applies where the parties do not operate in competitive or closely related product lines, but the FTDA "on its face is capable of application to competitive situations."[96]

■■■■■ To prevail under the FTDA, a mark's owner must show that: "(1) the senior mark [is] famous; [and] (2) distinctive; (3) the junior use [is] a commercial use in commerce; (4) it [ ] begin[s] after the senior mark has become famous; and (5)[ ] cause[s] dilution of the distinctive quality of the senior mark."[97] Because a famous mark can be protected under the FTDA *without* a showing of confusion, "the standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection."[98] It is not enough for a trademark holder to show that the mark has acquired secondary meaning. Rather, the plaintiff must demonstrate that the mark is *inherently distinctive* to prevail under the FTDA.[99]

■■■■ A plaintiff must next demonstrate the existence of *actual* dilution, although it need not prove actual loss of sales or profits.[100] The Supreme Court has explained:

---

**94.** *New York Stock Exch., Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 557 (2d Cir.2002) (quoting 15 U.S.C. § 1125(c)(1)). The FTDA provides, in relevant part, that: "The owner of a famous mark shall be entitled ... to an injunction against another person's commercial use ... of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...."

**95.** *TCPIP Holding Co.,* 244 F.3d at 95 (emphasis added); *see also id.* ("The [FTDA] offers no benefit to the consumer public—only to the owner.").

**96.** 4 McCarthy, *supra* note 82, § 24:72, at 24–136 (Supp.12/2003). McCarthy opines that "[i]t is difficult to understand why an anti-dilution law is invoked when the parties operate in competitive or closely related product or service lines. The legal theory of anti-dilution was conceived to protect strong marks against a diluting use by a junior users in a product or service line far removed from that in which the famous mark appears. Thus, using the anti-dilution law when the parties are competitors in the same market sounds a dissonant and false note. Why the need to invoke the 'super weapon' of anti-dilution law to resolve what appears to be a garden variety infringement case.". *But see Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 219 (2d Cir.1999) ("While the antidilution statutes aim at a different harm than the infringement statute and dilution undoubtedly can occur among non-competing products, we see no reason why dilution cannot occur as well where the products are competing."), *abrogated on other grounds, Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).

**97.** *Nabisco,* 191 F.3d at 215.

**98.** *Empresa Cubana del Tabaca,* 2004 WL 602295, at *33 (quotation marks and citation omitted).

**99.** *See New York Stock Exch.,* 293 F.3d at 556–57.

**100.** The Supreme Court [in *Moseley* ] in essence made it more difficult for dilution claims to succeed because plaintiffs face a much higher hurdle of demonstrating actual dilution, but the Court was silent as to the manner in which courts must evaluate plaintiffs' success in overcoming that hurdle. This silence could imply that a test designed to measure likelihood of dilution may not be appropriate to evaluate actual dilution, but we are left without firm guidance on the issue. *AutoZone, Inc. v. Tandy Corp.,* 373 F.3d 786, 804 (6th Cir.2004).

[W]here the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution.... [S]uch mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner.... [101]

## D. New York Law

### 1. Trademark Infringement and Unfair Competition

■ The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition "mirror the Lanham Act claims." [102] In addition, to succeed on the merits of a "common law claim of unfair competition, [a plaintiff] must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant's] bad faith." [103]

### 2. Section 360-l of the New York General Business Law

■ "New York's anti-dilution statute provides broader protection than trademark and unfair competition laws. It is designed to prevent ... the gradual whittling away of a firm's distinctive trademark or name." [104] Section 360-1 of New York's General Business Law protects the distinctive quality of a mark even in the absence of competition or confusion. [105] Courts have held that "the necessary elements for a dilution or injury to business reputation claim are [ (1) ] the possession of a distinctive trademark and [ (2) ] likelihood of dilution." [106]

■ Dilution claims brought under New York law differ from those premised on the FTDA in at least three respects. *First,* "New York law accords protection against dilution to marks that are distinctive as a result of *acquired secondary meaning* as well as to those that are inherently distinctive." [107] *Second,* to prevail on a state law dilution claim, a plaintiff need only show a *likelihood* of dilution. [108]

101. *Moseley,* 537 U.S. at 433, 123 S.Ct. 1115.

102. *TCPIP Holding Co. v. Haar Communications,* No. 99 Civ. 1825, 2004 WL 1620950, at *6 n. 5 (S.D.N.Y. July 19, 2004); *see also Standard & Poor's Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982) ("The heart of a successful claim based upon ... the Lanham Act ... and common law trademark infringement is the showing of likelihood of confusion as to the source or sponsorship of defendant's products."). "[U]nfair competition laws prohibit a broader range of unfair trade practices [than prohibited by trademark laws] generally described as the misappropriation of the skill, expenditures and labors of another." *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 363 (S.D.N.Y.1998) (quotation marks and citation omitted).

103. *Philip Morris USA Inc. v. Felizardo,* No. 03 Civ. 5891, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004).

104. *Katz v. Modiri,* 283 F.Supp.2d 883, 900 (S.D.N.Y.2003) (quotation marks and citations omitted).

105. *See* N.Y. Gen. Bus. Law § 360-l (McKinney Supp.2004) ("Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark ... shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.").

106. *Scholastic, Inc. v. Stouffer,* 124 F.Supp.2d 836, 848 (S.D.N.Y.2000).

107. *New York Stock Exch.,* 293 F.3d at 557 (emphasis added).

108. *See Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* No. 00 Civ. 5304, 2004 WL 896952, at *8 n. 8 (E.D.N.Y. Mar.26, 2004) ("Since the *Moseley* decision ..., the majority of New York federal district courts reviewing N.Y. Gen. Bus. Law § 360–[l] have ruled that *Moseley* has not changed the prevailing state test for dilution, which focuses on the 'likelihood' of dilution rather than 'actual' dilution.") (citing cases).

*Third,* dilution under New York law "can involve either blurring or tarnishment."[109]

 Blurring occurs "where the defendant uses or modifies [a plaintiff's] trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the [plaintiff's] product."[110] "To determine the likelihood of blurring, [courts look] to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."[111] Alternatively, "[t]arnishment occurs where a trademark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the [plaintiff's] unrelated goods.' "[112]

## III. DISCUSSION

### A. Delay

 As a threshold matter, I note that any "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."[113] This is true "unless the plaintiff is unaware of the severity of the infringement or the delay is attributable to the plaintiff's good faith efforts to investigate the infringement."[114] "Though such delay may not warrant the denial of ultimate relief, it may, standing alone, ... preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."[115]

 Dooney & Bourke suggests that Louis Vuitton's claims are barred because Louis Vuitton: (1) "sat on its rights with-

---

**109.** *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F.Supp.2d 273, 301 (S.D.N.Y.2002) (quoting *New York Stock Exch.,* 293 F.3d at 557). By contrast, it is now questionable whether dilution by tarnishment is covered by the FTDA. *See Moseley,* 537 U.S. at 432, 123 S.Ct. 1115 ("The District Court's decision in this case rested on the conclusion that the name of petitioners' store 'tarnished' the reputation of respondents' mark, and the Court of Appeals relied on both 'tarnishment' and 'blurring' to support its affirmance. Petitioners have not disputed the relevance of tarnishment ... presumably because that concept was prominent in litigation brought under state antidilution statutes and because it was mentioned in the legislative history. Whether it is actually embraced by the statutory text, however, is another matter. Indeed, the contrast between [ ] state statutes ... and the federal statute ... arguably supports a narrower reading of the FTDA."). *But see MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.,* No. 00 Civ. 6068, 2004 WL 434404, at *6 (S.D.N.Y. Mar. 8, 2004) ("Under both federal and New York law, dilution can involve either blurring or tarnishment.").

**110.** *GTFM,* 215 F.Supp.2d at 301 (quoting *Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 43 (2d Cir.1994) (emphasis omitted)); *accord Federal Express,* 201 F.3d at 175.

**111.** *New York Stock Exch.,* 293 F.3d at 558.

**112.** *GTFM,* 215 F.Supp.2d at 301 (quoting *New York Stock Exch.,* 293 F.3d at 558).

**113.** *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir.1995); *see also Brockmeyer,* 2002 WL 1402320, at *4–5. "The doctrine [of laches] reflects the principle that 'he who comes into equity must come with clean hands.' " *National Council of Arab Ams. v. City of New York,* No. 04 Civ. 6602, 2004 WL 1873037, at *6 (S.D.N.Y. Aug.23, 2004) (quoting *Hermes Int'l,* 219 F.3d at 107).

**114.** *Brockmeyer,* 2002 WL 1402320, at *5.

**115.** *Tough Traveler,* 60 F.3d at 968 (quotation marks and citations omitted).

out communicating any concern to [Dooney & Bourke] for more than half a year.... This period of utter inactivity alone should rebut any presumption of irreparable harm and be fatal to Vuitton's motion"; (2) "waited six *more* months before taking any action to enforce its supposed rights."[116] But Louis Vuitton offers a reasonable explanation for the delay, suggesting that the time that elapsed between its discovery of the allegedly infringing and diluting bags and the filing of this lawsuit is attributable to its efforts to conduct an investigation and weigh the costs and benefits of pursuing a lawsuit.[117] Although Louis Vuitton's delay in seeking relief informs the question of whether it has suffered irreparable harm, the delay is not so lengthy as to require denial of the motion.

### B. Trademark Infringement Under the Lanham Act

#### 1. Validity of the Mark

#### a. Definition of the Mark

 Dooney & Bourke contends that because "it is impossible to pin down exactly what Vuitton claims exclusive rights to," Louis Vuitton's unregistered Multicolore and Eye Love monograms are not protectible.[118] However, Louis Vuitton has identified the trademark at issue with precision, stating that it covers: (1) the interlocking initials interspersed in a repeating pattern with the registered geometric shapes, (2) used in combination with the thirty-three special Murakami colors, (3) set against a white or black background.[119]

Louis Vuitton has presented ample evidence suggesting that these unregistered marks are inherently distinctive (fanciful or arbitrary marks) *and* have attained secondary meaning and fame. *First,* consumers have associated the Toile Monogram mark with Louis Vuitton for over a century.[120] *Second,* the Monogram Multicolore marks were created as source-identifying marks—new trademarks based on the original registration, and they rapidly garnered acclaim, becoming the symbol of Louis Vuitton in the new millennium.[121] Accordingly, Louis Vuitton has adequately demonstrated that the Monogram Multicolore and Eye Love marks are "valid," for purposes of this motion.

---

**116.** Def. Opp. at 35.

**117.** *See* Tr. at 132–35 (Barbault); Plaintiff's Reply Memorandum of Law in Further Support of Its Motion for Preliminary Injunction ("Reply Mem.") at 23.

**118.** Def. Opp. at 10. As an initial matter, I note that Louis Vuitton has made numerous statements that this is *not* a trade dress case and accordingly, I do not treat it as one. Moreover, unlike the traditional gold and chestnut colors, the thirty-three Murakami colors set against white and black backgrounds are not explicitly claimed on Louis Vuitton's registrations of its Toile Monogram. Nonetheless, Louis Vuitton *has* registered the elements of its toile monogram without reference to color, indicating that whenever these patterns are used in *any* color, the resulting toile monogram mark might be infringed. *See* 3 McCarthy, *supra* note 82, § 19:58, at 19–183 (Supp.6/2004) ("A mark not limited to one color in effect covers the mark as it appears in any color."); *accord id.* § 7:45.1, at 7–118.10. Louis Vuitton has asserted claims under *both* sections 32 and 43 of the Lanham Act, thus claiming protection of the marks, whether registered or unregistered. However, because the result is the same either way, I treat the Monogram Multicolore and Eye Love marks as unregistered trademarks.

**119.** *See, e.g.,* Compl. ¶ 16; Tr. at 84–87, 167–68 (Barbault); Tr. at 1084 (Theodore Max, counsel for Louis Vuitton).

**120.** *See, e.g.,* Barbault Aff. ¶¶ 6–14; *Louis Vuitton Malletier v. Veit,* 211 F.Supp.2d 567, 574 (E.D.Pa.2002) (finding Louis Vuitton's registered trademarks world famous).

**121.** *See supra* notes 15–16, 23–24 and accompanying text.

■ That said, to the extent Louis Vuitton may be claiming trademark protection for the array of (Murakami) multiple colors *alone*, its argument lacks merit. The Supreme Court has explicitly foreclosed the argument that color, standing alone, can ever be "inherently distinctive."[122] Rather, colors are only protectible where the senior user has made a showing of secondary meaning, *i.e.*, that consumers have come to "treat a particular color on a product or its packaging ... as signifying a brand."[123] Although Louis Vuitton has demonstrated that consumers associate the Monogram Multicolore marks with Louis Vuitton; there has been no showing that consumers similarly identify the use of multiple bright colors against a black or white background in connection with *any* design, with Louis Vuitton.[124] To grant Louis Vuitton a monopoly over all multicolored repeating monograms set against a black or white background would hinder competition in the marketplace, thereby contravening one of the precepts of trademark law.[125] Moreover, granting Louis Vuitton a trademark on its use of a color scheme alone would require a precise definition of each and every color combination claimed.[126]

### b. Aesthetic Functionality

■ Dooney & Bourke next submits that the doctrine of aesthetic functionality bars the enforcement of Louis Vuitton's claimed trademark for any purpose.[127] The Second Circuit has explained the concept of aesthetic functionality as follows:

> [W]here an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection. This rule ... requir[es] a finding of foreclosure of alternatives while still ensuring that trademark protection does not exclude competitors from substantial markets.[128]

**122.** *See Wal–Mart Stores*, 529 U.S. at 211, 120 S.Ct. 1339 ("[W]ith respect to at least one category of mark—colors—we have held that no mark can ever be inherently distinctive.... [A] color [can] be protected as a trademark, but only upon a showing of secondary meaning.").

**123.** *Id.* at 212, 120 S.Ct. 1339 (quoting *Qualitex*, 514 U.S. at 163, 115 S.Ct. 1300).

**124.** Indeed, Dooney & Bourke commissioned a study suggesting that "the large majority of relevant U.S. consumers do not associate a multicolor monogram pattern uniquely with Louis Vuitton, and indeed that look is associated with a very large number of sources." *See* Study of the Extent of Consumers' Recognition of Louis Vuitton as the Source of Its Toile Monogram Pattern, When Presented in Multicolor and When Presented in Black and White Prepared by Guideline Associates, Pl. Ex. 202, at 3.

**125.** *See Qualitex*, 514 U.S. at 164, 115 S.Ct. 1300. *See generally* 1 McCarthy, *supra* note 82, ch. 1 (discussing the basic principles of unfair competition).

**126.** *See generally* 1 McCarthy, *supra* note 82, § 7:45, at 7–118.1–7–118.14 (Supp.6/2004). Furthermore, it does not seem that Louis Vuitton is claiming such a trademark.

**127.** *See* Tr. at 1073 (Roger Brooks, counsel for Dooney & Bourke); *see also* Def. Opp. at 15–17.

**128.** *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 81 (2d Cir. 1990). "The functionality doctrine, the Supreme Court has [] explained, 'prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.'" *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir.1995) (quoting *Qualitex*, 514 U.S. at 164, 115 S.Ct. 1300).

Dooney & Bourke's reliance on this doctrine is misplaced. Granting trademark protection to Louis Vuitton's Monogram Multicolore and Eye Love marks does not prevent Dooney & Bourke from using its own monogram in a spectrum of colors on its leather goods. Rather, it prohibits only the use of patterns "so similar as to create a likelihood of confusion."[129] Thus, the doctrine of aesthetic functionality does not bar Louis Vuitton from claiming protection for its Monogram Multicolore and Eye Love marks.

### 2. Likelihood of Confusion

#### a. Factor 1: Strength of Louis Vuitton's Marks

 Neither party disputes the strength of Louis Vuitton's Toile Monogram. As noted in Part III.B.1, Louis Vuitton has adequately shown that the Monogram Multicolore trademarks are not only inherently distinctive, but have also attained secondary meaning in the marketplace. The new Monogram Multicolore and Eye Love trademarks are strong marks.

#### b. Factor 2: Similarity of the Marks

Visual comparison of the Louis Vuitton and Dooney & Bourke handbags reveals that there are obvious similarities. For instance, both handbags feature multicolored monograms against a solid white or black background. Also, the handbags are available in similar shapes.

But "[t]he fact that there are similarities between marks does not necessarily render one of them confusing"[130] and, for several reasons, Dooney & Bourke's marks are not *confusingly* similar to those of Louis Vuitton. *First,* it could not be more obvious that Louis Vuitton uses the initials "LV," while Dooney & Bourke uses its trademarked "DB" logo. Thus, a consumer seeing these trademarks printed on these bags, either up close or at a distance, is not likely to be confused. *Second,* the Dooney & Bourke bags only use their "DB" initials; there are no geometric shapes interspersed with the monogram. *Third,* there are clear differences between the competing bags. The Louis Vuitton bags prominently display metal studs, gold-toned zippers, and have much larger initials printed on them than do the Dooney & Bourke bags. Moreover, each of the Dooney & Bourke bags have a pink enameled heart, inscribed with the words "Dooney & Bourke," hanging prominently from a leather strap attached to the multicolored zipper.

This leaves only a similar choice of color scheme—the multicolored initials on the Dooney & Bourke bags printed on a white or black background. As noted in Part III.B.1, Louis Vuitton's trademarks do not cover *all* uses of a multicolored logo against a white or black background because the use of multiple colors, when divorced from the geometric shapes and "LV" monogram, lack secondary meaning. Moreover, because the colors used on the Dooney & Bourke bag are noticeably toned down, and consequently fail to evoke the characteristic "friction" sparked by Murakami's bright, clashing colors, the Louis Vuitton marks create a very different overall impression (*i.e.,* large interspersed shapes and initials in crisp, bold colors) than the Dooney & Bourke bags (*i.e.,* tightly interlocked initials in dulled colors).[131] Accordingly, Louis Vuitton has

---

**129.** *Knitwaves,* 71 F.3d at 1006.

**130.** *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,* No. 04 Civ. 2644, 2004 WL 1161167, at *8 (S.D.N.Y. May 24, 2004).

**131.** *See* Tr. at 432 (Jacobs) (describing the "friction" created by the clashing colors). Even the "white" of the Dooney & Bourke bags is a duller version of the shade used by Louis Vuitton—it is more accurately described as "ecru" or off-white.

failed to demonstrate that the similarity between the overall impression generated by the two marks is likely to lead to consumer confusion. This factor weighs in favor of Dooney & Bourke.

### c. Factor 3: Proximity of the Products and Factor 4: Likelihood Louis Vuitton Will "Bridge the Gap"

The parties do not seriously dispute that the products compete in the same markets.[132] Both parties are in the business of making, distributing, and selling handbags and other fashion accessories.[133] Both parties' handbags are sold in similar high-end retail establishments, located in close geographic proximity.[134] The only notable difference between the bags in this context is the price differential.[135] But because Dooney & Bourke has not shown that price meaningfully divides purchasers in the marketplace, it does not follow that Dooney & Bourke and Louis Vuitton handbags are not competing in the same basic market.[136] Accordingly, this factor favors Louis Vuitton.

### d. Factor 5: Existence of Actual Confusion

With the exception of a handful of e-mail messages sent from unidentified customers, Louis Vuitton has failed to present any evidence suggesting confusion among actual consumers.[137] In light of the amount of time that the Dooney & Bourke bags have been on the market (approximately one year) and the number of It–

---

**132.** *See* Pl. Mem. at 19; Def. Opp. at 25–27 (omitting discussion of this Polaroid factor).

**133.** Louis Vuitton also claims that *other* products sold by Dooney & Bourke with the multicolored monogram against a white or black background—*e.g.,* umbrellas, picture frames, and pencil cases—infringe Louis Vuitton's Monogram Multicolore trademarks. *See* Tr. at 74–75 (Barbault). There is no indication that Louis Vuitton sells similar items. Nonetheless, because the focus of Louis Vuitton's lawsuit is on the handbags, I do not view proximity of the products as presenting a serious issue.

**134.** *See* Barbault Aff. ¶ 71.

**135.** *Compare, e.g.,* Barbault Aff. ¶ 50 (price of Louis Vuitton bags between $360 to $3,950), *with* Tr. at 791 (Philip Kinsley, Vice President of Finance for Dooney & Bourke) (price of Dooney & Bourke It–Bags between $125 to $350 dollars).

**136.** *See* Tr. at 984 (Dawn Mello, Fashion Expert for Louis Vuitton) ("You might buy something for a 150, $200 for a weekend, you know, to kick around with, wear with jeans and so forth, and you save your $1500 bag for special occasions."); *id.* at 642 (Dooney) ("I think anyone who manufactures a handbag and purse is in some way a competitor [of Dooney & Bourke]."). There is evidence suggesting that the companies target different demographic groups—*i.e.,* that Dooney & Bourke caters to teenagers, while Louis Vuitton appeals to older women. *See, e.g.,* Dooney & Bourke Catalogue (Spring 2004). Without more, this is insufficient to find that proximity of products favors Dooney & Bourke.

**137.** *See* 8/23/03 E–Mail to Dooney & Bourke, D & B 00004345, Ex. L to LeGrand Aff. ("On MTV they are featuring Jessica Simpson … who is shown carrying a handbag that looks very much like the new IT BAG. Any way to find out which one this is? Is she perhaps promoting the bag for Dooney–Bourke?"); 1/14/04 E–Mail to Dooney & Bourke, Pl.Ex. 325 ("THE IT BAG SATCHAL [sic] DO YOU HAVE THE LARGE ONE OR A MEDIUM ONE THAT JESSICA SIMPSON HAS?"); 1/27/04 E–Mail to Dooney & Bourke, Pl.Ex. 324 ("i dont [sic] know if you guys would know this or not, but i was wondering if you knew wich [sic] Dooney & Bourke bag Jessica Simpson or Paris Hilton has? If you dont [sic] know, its no biggie, dont [sic] worry about it."); 4/16/04 E–Mail to Dooney & Bourke, Ex. L to LeGrand Aff. ("ON the IT bags, are they the same as Louis Vuitton?"); *see also* Tr. at 117 (Barbault).

Bags sold, the fact that three consumers expressed confusion is meaningless. Indeed, because Dooney & Bourke has sold over 500,000 (white and black) units,[138] Louis Vuitton's inability to produce more evidence of "real world" confusion is striking.[139]

Lacking direct evidence of actual confusion, Louis Vuitton relies primarily on indirect proof in the form of survey data. Indeed, both parties commissioned and presented studies that, not surprisingly, reach contrary conclusions: Louis Vuitton's expert, Dr. Jacob Jacoby, found consumer confusion; Dooney & Bourke's expert, Robert Reitter, detected no (statistically significant) confusion.[140] For the reasons set forth below, I accord little weight to either study.

### i. Jacoby Confusion Study

 Dr. Jacoby's Confusion Study is designed to test Louis Vuitton's belief that Dooney & Bourke's

> use of a monogram with multiple bright colors in a repeating pattern similar to the Louis Vuitton Multicolore design would cause consumers to be confused or mistaken into believing that Dooney's "It Bag" originated from Louis Vuitton, or were sponsored or approved by Louis Vuitton, or that there was a relationship between Louis Vuitton and Dooney.[141]

The survey of 112 respondents intercepted at shopping malls in the United States and taken to testing areas in those malls, yielded a "net confusion"[142] figure equal to 25%, a figure that Dr. Jacoby revised during the hearing, after reclassifying three responses categorized incorrectly as "confused," to 22%.[143] In other words, Dr.

---

**138.** *See* Monthly Sales of "It" Products (in units) by Color (reflecting total units of It Collection handbags and small leather goods in all colors through May 2004 equal to approximately 761,420 of which an estimated 581,580 were black or white). *See generally* Monthly Sales of "It" products (in units) by Type of Product, Def. Ex. 202 (total units of It Collection products—all colors and products—sold through May 2004 equal to nearly 900,000).

**139.** *See* 3 McCarthy, *supra* note 82, § 23:18, at 23–68 (Supp.3/2003) ("The absence of evidence of actual confusion is less significant when the period in which the two marks have co-existed is relatively short. But as the duration of non-confusing co-existence stretches into years, the force of the inference [of no confusion] strengthens."); *see also Libman,* 69 F.3d at 1361 ("The evidence of likelihood of confusion in this case is vanishingly thin. Vining sold several hundred thousand of the allegedly infringing brooms, yet there is no evidence that any consumer ever made such an error; if confusion were likely, one would expect at least one person out of this vast multitude to be confused, or more precisely one would expect Libman to have been able to find one such confused person.").

**140.** *See* April 2004 Expert Report of Jacob Jacoby, Ph.D., on Likelihood of Confusion ("Jacoby Confusion Study"), Pl.Ex. 551, at 5;

July 2004 Study of the Likelihood of Source Confusion Between Dooney & Bourke and Louis Vuitton Created by Dooney & Bourke's Use of Color on Its Monogram Patterned Handbags Prepared by Guideline Associates ("Reitter Confusion Study"), Ex. A to 7/2/04 Affidavit of Robert N. Reitter ("Reitter Aff."), Def. Ex. 304, at 2.

**141.** Jacoby Confusion Study at 3.

**142.** "Net confusion" represents the level of confusion obtained with the Dooney & Bourke It–Bag (test bag) minus the average level of confusion obtained with the control bags. *See id.* at 5. Of the 112 respondents, 109 responses were used to calculate the net confusion figures. *See id.*

**143.** *See* Tr. at 304. Other than the three miscoded data responses, there appear to be no other significant "data reporting" issues raised by Dr. Jacoby's Confusion study. As such, I do not address accuracy of data reporting under a separate heading.

Similarly, consideration of the qualifications of the experts warrants only brief discussion. "To be sure, courts have both lauded and criticized previous studies conducted by Dr. Jacoby." *Mark Bric Display Corp. v. Joseph Struhl Co.,* No. 98 Civ. 532, 2003 WL 21696318, at *8 (D.R.I. July 9, 2003) (citing

Jacoby claims that approximately

> one out of four respondents was confused into believing that the Dooney & Bourke bag either:
>> was the same as or came from the same company that put out, the Louis Vuitton bag (11%),
>>
>> came from a company that had a business connection or relationship with the company that put out the Louis Vuitton bag (7%), or
>>
>> obtained, or needed to obtain permission or authorization from the company that put out the Louis Vuitton bag (7%).[144]

### 1. Universe of the Survey [145]

Dr. Jacoby defined the relevant survey population as "females who were 16 years of age or older and were potential Louis Vuitton or Dooney & Bourke customers (or potential customers of both)." [146] Dr. Jacoby states that:

> To be classified as a potential Louis Vuitton customer, in the past year or two, the respondent had to have bought a handbag costing more than $350, or a purse or wallet costing more than $100, or say she was likely to do so in the next

year or so. To be classified as a potential Dooney & Bourke customer, in the past year or two, the respondent had to have bought a handbag costing $100 to $350, or a purse or wallet costing $50 to $100, or say she was likely to do so in the next year or so. Some respondents qualified for both groups.[147]

Dooney & Bourke contends that Dr. Jacoby used ambiguous qualifying questions. That is, interviewers used the word "purse" in the screening questions, without specifying that the word meant "coin purse" or a similarly small item; rather than a bag worn over the shoulder.[148] If a person indicated that she had or was likely to purchase a purse or wallet costing more than $100, she was a potential Louis Vuitton consumer; if she was likely to buy a purse or wallet costing between $50 and $100 dollars, she was a potential Dooney & Bourke consumer.[149]

According to the dictionary, a "purse" is defined primarily as, "[a] woman's bag for carrying keys, a wallet, and other personal items; a handbag" and secondarily as, "[a] small bag or pouch for carrying money." [150] Because "purse" and "handbag" are synonymous, the respondent pool used in the

cases); *see also National Football League Props. v. ProStyle*, 57 F.Supp.2d 665, 667 (E.D.Wis.1999) (citing many cases critical of Jacoby's various studies). Dr. Jacoby made the astonishing claim that in ninety percent of the roughly one hundred cases acknowledging him as an expert, the judge not only agreed with his opinion based on his survey results, but also cited him as the basis for it. *See* Tr. at 389. Despite the evidence pro and con, there is no reason to accord less weight to Dr. Jacoby's survey because of his qualifications.

144. Jacoby Confusion Study at 5.

145. The universe of respondents selected is an important component of the survey, and as such, merits careful consideration. *See* 5 McCarthy, *supra* note 82, § 32:159, at 32–250.12 (Supp.12/2000) ("Identification of the

proper universe is recognized uniformly as a key element in the development of a survey.") (quotation marks and citation omitted).

146. Jacoby Confusion Study at 9.

147. *Id.; see also* Project Study Screener, Appendix F to Jacoby Confusion Study, at 1 (Question B1); *id.* at 2 (Question B2).

148. Def. Opp. at 23; *see also* Dr. Yoram Wind's Evaluation of Dr. Jacoby's Studies, Ex. B to 7/2/04 Affidavit of Yoram Wind, Ph.D. ("Wind Aff.") in Opposition to Plaintiff's Motion for Preliminary Injunction, Def. Ex. 400, ¶ 9.

149. *See* Jacoby Confusion Study at 9.

150. The American Heritage Dictionary of the English Language 1423 (4th ed.2000).

Jacoby Confusion Study likely suffers from over-inclusiveness. "[E]ncompassing a group of people that includes those whose perceptions are not relevant ... [skews] the results by introducing irrelevant data." Consequently, the weight accorded to the study necessarily decreases.[151]

### 2. Survey Methodology and Execution

Dooney & Bourke argues that the survey is "irremediably flawed," in part, because it was not "conducted in the manner described in [Dr. Jacoby's] expert report, but was conducted in two separate rounds, with the design modified halfway through to increase the number of 'confusion' responses."[152] Dr. Jacoby testified that the survey was conducted in two parts. During phase one, fifty-eight respondents were interviewed, and shown one of four different Dooney & Bourke bags or accessories.[153] A percentage of the respondents expressed confusion as to each of the four bags as follows: 10 % (Bag 33); 7% (Bag 34); 6% (Bag 35); 5% (Bag 36).[154] During phase two, fifty-one additional interviews were performed, and rather than being shown four bags, respondents were shown only one of the four Dooney & Bourke items—Bag 33.[155] Dr. Jacoby explained that, although phase two of the study should have been run with two bags, the

white and black wristlets, due to a "mistake" on the part of Dr. Kaplan (who was responsible for the interview process), only the white wristlet was used.[156] Dooney & Bourke points out that this "oversight" on Dr. Kaplan's part resulted in the exclusion of the three bags that had generated less confusion among respondents than had the white wristlet.[157] Although it is impossible to measure the impact of this mistake, Dr. Jacoby's report hints at the dangers associated with the use of one, rather than two, bag(s), stating, "To be able to show that the effects obtained were not due to having used a single, perhaps atypical, Dooney bag, respondents were shown one of two Dooney Test bags."[158]

### 3. Questions Asked in the Survey

Dooney & Bourke next challenges the basis for Dr. Jacoby's finding that seven percent of respondents mistakenly believed that Dooney & Bourke "obtained, or needed to obtain, permission or authorization from the company that put out the Louis Vuitton bag."[159] Dr. Jacoby draws this conclusion from respondents' answers to a series of questions asking those surveyed to indicate whether "to come out with this bag," the company "needed to get permission or a license from the company whose bags were shown in the ad [Louis

---

151. 5 McCarthy, *supra* note 82, § 32:160, at 32–252 (Supp.12/2000); *see also* Reference Manual on Scientific Evidence, *supra* note 85, at 242.

152. Def. Opp. at 21.

153. *See* Tr. at 260 (Jacoby); *see also* Def. Exs. 1284 (white Dooney & Bourke large wristlet, labeled "Bag 33" in the study), 1285 (black Dooney & Bourke large wristlet, "Bag 34"), 1286 (white Dooney & Bourke skinny coin purse, "Bag 35"), 1287 (black Dooney & Bourke skinny coin purse, "Bag 36").

154. *See* Draft Results of LV Pilot (2/9/04), Def. Ex. 614; *see also* Tr. at 260 (Jacoby).

155. *See* Tr. at 261.

156. *Id.* at 260, 264 (Jacoby).

157. Dr. Jacoby counters that with a sample size of only fifty-eight, the percentage spread lacks statistical significance. *See id.* at 242–44, 266. This may be true, but even Dr. Jacoby testified that he does not know what the results of the survey would have been had he used either the black coin purse or wristlet. *See id.* at 267.

158. Jacoby Confusion Study at 8.

159. *Id.* at 5.

Vuitton]."[160] Similar questions have been included in previous Jacoby studies and rejected by courts because they improperly ask respondents for a legal conclusion.[161] For that reason, answers to this question, and the finding of seven percent confusion as to product sponsorship, carry little weight.

### ii. Reitter Confusion Study

 Because Louis Vuitton has not shown actual confusion, Dooney & Bourke's survey evidence demonstrating the *absence* of confusion merits only brief discussion. Dooney & Bourke's expert offers his own confusion study.[162] Participants in the Reitter Confusion Study were women likely to purchase a purse or handbag costing more than $100, intercepted at shopping malls and divided into a test and control group.[163] Interpretation of these responses yielded a "net confusion" figure of 0.2%.[164] However, there are several reasons to question this figure.

*First,* the Reitter Confusion survey is essentially a reading test. In particular, interviewers were instructed that:

**WHEN SHOWING THE BAG MAKE SURE THAT THE HEART SHAPED BRASS NAME SIGN FACES SO THE RESPONDENT IS ABLE TO READ THE NAME DOONEY & BOURKE.... WHEN THE RESPONDENT INDICATES SHE IS FINISHED EXAMINING THE BAG, UNOBTRUSIVELY PLACE THE HEART SHAPED BRASS NAME SIGN SO THAT THE NAME DOONEY & BOURKE FACES AGAINST THE BAG, AND THE PLAIN SHINY SIDE FACES OUT, AND PLACE THE BAG ABOUT 5 FEET AWAY FROM THE RESPONDENT.[165]**

Participants were then asked "What company do you think makes this handbag?"[166]

As a matter of logic, "[s]urveys which do nothing more than demonstrate the respondents' ability to read are not probative of the issue of likelihood of consumer confusion."[167] However, "when the source of the alleged confusion is not just a name,

---

**160.** Main Questionnaire, App. F to Jacoby Confusion Study, at 5 (questions 4a–4d).

**161.** *See, e.g., National Football League Props.,* 57 F.Supp.2d at 666–67; *Novo Nordisk of N. Am., Inc. v. Eli Lilly & Co.,* No. 96 Civ. 5787, 1996 WL 497018, at *6 nn. 24, 26 (S.D.N.Y. Aug.30, 1996). *But see Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 850 F.Supp. 232, 247 (S.D.N.Y.1994). As the *National Football League Properties* court notes:

The court may have been more sympathetic ... had Jacoby himself not formulated the same survey question rejected in *Novo Nordisk* and had that court not suggested to him what would have been acceptable. However, Jacoby apparently has not learned from his mistakes which, contrary to plaintiffs' assertions that Jacoby's surveys "have been universally relied upon" and have never been rejected by a court, seem to be numerous.

*National Football League Props.,* 57 F.Supp.2d at 667. Dr. Jacoby is clearly aware of this criticism. *See* Tr. at 222–23.

**162.** Reitter Confusion Study at 1.

**163.** The test group of 308 respondents were "shown a handbag or a line-up of handbags bearing the multicolor monogram pattern." Reitter Confusion Study at 2. Reitter found only 5.5% confusion among these participants. *See id.* The second group (265 people) was shown a monochrome Dooney & Bourke monogram handbag and of them, 5.3% "connected these handbags with Louis Vuitton for pattern, style or color reasons." *Id.*

**164.** *See id.* at 26.

**165.** Field Instructions, App. C to Reitter Confusion Study (typeface as in original); *see also* Tr. at 898–901 (Reitter) (describing these instructions).

**166.** Questionnaires, App. B to Reitter Confusion Study (Main Questionnaire, question 1a).

**167.** *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.,* 988 F.Supp. 322, 335 (S.D.N.Y. 1997).

word or phrase," the survey at issue can still be "helpful and any shortcomings will simply affect [its] probative value, not destroy it completely." [168] The degree of subtlety employed by interviewers in flipping the hearts cannot be known absent video footage of each interview, but the obvious implications of Reitter's choice to display Dooney & Bourke's name immediately before asking respondents to identify the source of the bag undermines the import of their answers.

Moreover, due to several miscoded responses and Reitter's poor choice of one of the control bags, the survey improperly inflates the number of responses illustrative of "noise," which in turn erroneously deflates the confusion figures. [169] Reitter's failure to take into account the similarity between his brown, monochrome Dooney & Bourke control bag and Louis Vuitton's traditional gold and chestnut bag decreases the probative value of his study.

### iii. Summary of Actual Confusion Evidence

In sum, Louis Vuitton has failed to present compelling direct evidence supporting a finding that *actual* confusion exists among consumers. Moreover, Louis Vuitton's reliance on the Jacoby study to meet its burden is misplaced, as that survey merits little, if any, weight because of its many flaws, both in design and execution. The absence of direct evidence of consumer confusion favors Dooney & Bourke. [170]

### e. Factor 6: Sophistication of Consumers

Dooney & Bourke argues that "[c]ustomers who shop for [expensive] products in high-end department and specialty stores tend to be sophisticated and discriminating customers." [171] That consumers seeking to purchase Louis Vuitton and Dooney & Bourke handbags exercise a great deal of care in making purchasing decisions makes sense given the relatively high price of the products and the upscale locations where they are retailed. [172] Accordingly, sophistication of purchasers strongly favors Dooney & Bourke.

### f. Factor 7: Bad Faith and Factor 8: Quality of Dooney & Bourke's Products

"The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." [173] Even though Louis Vuitton has shown that Peter Dooney likely imitated certain aspects of Louis Vuitton's Murakami handbags, this does not mean that he acted in "bad faith," as defined in the Act.

The record shows that Peter Dooney and his It Team were aware of the Murakami design during the design process of the It–Bags. [174] Moreover, the timing of Dooney & Bourke's It–Bag line, following closely on the heels of the debut of Louis

---

**168.** *Conopco, Inc. v. Cosmair, Inc.,* 49 F.Supp.2d 242, 254–55 (S.D.N.Y.1999).

**169.** Tr. at 915–31 (Reitter).

**170.** *See Louis Vuitton Malletier,* 2004 WL 1161167, at *8.

**171.** Def. Opp. at 26 (quotation marks and citation omitted); *see also Conopco,* 49 F.Supp.2d at 256–57.

**172.** *See* 3 McCarthy, *supra* note 82, § 23:95, at 23–246–47 (Supp.6/2002) ("If the goods are

expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration. Thus, confusion is less likely than where the goods are cheap and bought casually.").

**173.** *Streetwise Maps,* 159 F.3d at 745.

**174.** *See, e.g.,* Pl.Ex. 45; Photograph of It Team Viewing Canvases; *supra* note 32 and accompanying text.

Vuitton's Murakami bags is more than merely fortuitous. There is also reason to doubt Dooney's claim that he was merely following a general trend in the fashion world toward "happy colors" (predicted by a publication that he had not read).[175] As Mello, a veteran of the fashion industry, testified, the trend toward bright colors was *started* by Louis Vuitton.[176] Thus, it could reasonably be inferred that Dooney intentionally copied the Louis Vuitton multicolored "look" and that he intended to "ride on the coattails" of Louis Vuitton. As a result, Louis Vuitton has adequately demonstrated that Dooney borrowed elements from its "look"—the multicolored monogram against a white or black background. Nonetheless, there is absolutely no proof that Dooney & Bourke attempted to deceive consumers. Accordingly, this factor tips in favor of Dooney & Bourke.

As for the quality of Dooney & Bourke's bags, compared to those of Louis Vuitton, there are differences suggesting that the latter bags are of higher quality (a difference that is clearly reflected in the price). But the fact that the competing bags are not of equal quality suggests that consumers may be *less* confused by any alleged

similarities in overall appearance. Moreover, there is insufficient evidence that Dooney & Bourke's products are notably inferior to those of Louis Vuitton. There are customer complaints about *both* parties' bags.[177] Granted, there are more complaints about the Dooney & Bourke bags, but this is not unexpected, given the greater number of bags sold.[178] On balance, this factor is neutral.

#### g. Balancing the Factors

In applying the *Polaroid* test, the court cannot lose sight of the key issue—whether *likelihood of confusion* exists between the senior and junior marks. According each of the factors its proper weight, it is quite clear that Louis Vuitton has not demonstrated that there is a likelihood of confusion (whether defined as reverse or forward; or initial interest, point-of-sale, or post-purchase) among consumers as to the source, authorization, or affiliation of Dooney & Bourke's handbags.

### 3. Requirements for Preliminary Injunction

Because Louis Vuitton has not shown that "a significant number of consumers

---

**175.** Tr. at 658 (noting the trend toward bright, happy colors); *see also id.* at 661 (conceding that he did not consult the Pantone report, *see* Pantone® Fashion Color Report (Spring 2003), Def. Ex. 111, that predicted the return of lighter colors).

Dooney also testified that he drew, at least *some*, "inspiration" from the designs of the late Ken Scott, a pioneer in the field of multicolor initials on handbags, circa 1950 to 1960. *See id.* at 650–57; *see also id.* at 727 ("I said he was part of the inspiration."). This may be true—there is, of course, no way of pinpointing the many sources of one's inspiration, *see, e.g., id.* at 417, 457 (Jacobs), but a visual inspection of Ken Scott's designs, *see* I Giardini di Ken Scott, *Arpel* (2001), Def. Ex. 107, plainly reveals that the multicolored "KS" used by Scott, ornately mingled with flowers and fruit and set against colorful backgrounds, is remarkably *dissimilar* from

Dooney's It–Bags. One could reasonably infer that the Dooney & Bourke bags reflect the more powerful influence of the Murakami-inspired fashion trend.

**176.** *See* Tr. at 958–59; *see also id.* at 981 (characterizing Louis Vuitton as a "leader" in the industry, and Dooney & Bourke as a "follower").

**177.** *See* 8/18/04 Stipulation Re: Consumer Complaints About Louis Vuitton Bags; 8/18/04 Stipulation Re: Consumer Complaints About Dooney & Bourke Bags.

**178.** *See* 8/18/04 Stipulation Re: Consumer Complaints About Dooney & Bourke Bags; *see also supra* note 138 and accompanying text (Dooney & Bourke's sales volume); Sales Report of Murakami Collection of Leather Goods, Pl.Ex. 32 (Louis Vuitton's sales volume).

are likely to be confused about the source of the goods identified by the allegedly infringing mark," [179] it must demonstrate irreparable harm and either a likelihood of success on the merits, or a serious question going to the merits and a balance of hardships tipping in its favor.[180]

 Louis Vuitton has not shown that it is likely to suffer irreparable harm. For instance, there is no evidence suggesting a probability of significant financial loss.[181] Indeed, the record suggests that Louis Vuitton is already unable to supply enough of the Monogram Multicolore bags to satisfy consumer demand.[182] Further, Louis Vuitton's own expert report revealed that, for at least some consumers, awareness of Dooney & Bourke's It–Bags makes Louis Vuitton's bag *more desirable*.[183] Finally, Louis Vuitton's delay in commencing this suit suggests that any "harm" it might suffer absent immediate relief, is not "irreparable."

 Even if it could demonstrate a serious question going to the merits, Louis Vuitton has also not shown that the balance of hardships tips in its favor. In fact, the balance of the hardships strongly favors Dooney & Bourke, which would face significant financial and reputational harm if enjoined from using its own monogram in connection with the It Collection.[184] Ac-cordingly, Louis Vuitton has not shown that it is entitled to preliminary injunctive relief.

## C. Trademark Dilution

 Louis Vuitton has shown for purposes of the trademark infringement claim that its Monogram Multicolore trademarks are inherently distinctive and famous.[185] Although the requisite showing is higher for a dilution claim,[186] even under this heightened standard, Louis Vuitton has adequately demonstrated the fame and distinctive quality of its mark. Additionally, Dooney & Bourke's use of its monogram in conjunction with its It Collection is a commercial use in commerce that began after Louis Vuitton's mark became famous.

This leaves only the question of whether Louis Vuitton has adequately demonstrated that it is likely to be able to prove actual dilution. In other words, does Dooney & Bourke's use of the multicolored monogram printed on the white and black backgrounds of its handbags "lessen[ ] the capacity" of Louis Vuitton's Monogram Multicolore trademarks "to identify and distinguish goods or services"? [187] Louis Vuitton attempts to satisfy its burden with: (1) a handful of e-mail messages sent by consumers that allegedly suggest dilution and (2) Dr. Jacoby's study purporting to reflect actual dilution.[188] For the reasons set forth below, this evidence is insufficient

179. *Virgin Enters.*, 335 F.3d at 146.

180. *See Federal Express*, 201 F.3d at 174.

181. *See Do The Hustle, LLC. v. Rogovich*, No. 03 Civ. 3870, 2003 WL 21436215, at *7 (S.D.N.Y. June 19, 2003) (" 'The possibility of monetary loss does not present a risk of irreparable harm.' ") (quoting *Manhattan Cable Television, Inc. v. Cable Doctor, Inc.*, 824 F.Supp. 34, 37 (S.D.N.Y.1993)).

182. *See* Tr. at 138–39 (Barbault).

183. *See* Draft Results of LV Pilot (2/9/04), Def. Ex. 614, at 3.

184. *See supra* notes 23–24 and accompanying text.

185. *See supra* Parts II, III.B; *see also* 7/26/04 Declaration of Heather Vandenberghe in Support of Plaintiff's Motion for Preliminary Injunction, Pl.Ex. 34, ¶ 11 ("Louis Vuitton has spent in the United States more than $3.8 million in advertising . . . the Monogram Multicolore products since the launch through June 2004."); Tr. at 504–12 (Vandenberghe).

186. *See Empresa Cubana del Tabaca*, 2004 WL 602295, at *33.

187. 15 U.S.C. § 1127.

188. *See* April 2004 Expert Report of Jacob Jacoby, Ph.D., on Dilution ("Jacoby Dilution Study"), Pl.Ex. 552.

to make the requisite showing of actual dilution.

### 1. Anecdotal Evidence of Dilution

Louis Vuitton offers a handful of e-mail messages from consumers that, at most, show that a few purchasers mentally associate the Monogram Multicolore marks with the Dooney & Bourke It Collection.[189] This anecdotal evidence is not compelling for at least two reasons. *First,* in light of the number of Dooney & Bourke products that have been sold, a smattering of e-mail messages allegedly showing dilution is hardly persuasive.[190] *Second,* mere mental association between the products is simply not enough, and these e-mails do not demonstrate that the presence of the Dooney & Bourke It products on the market have weakened the capacity of the Monogram Multicolore marks to identify Louis Vuitton's handbags.[191]

### 2. Survey Evidence of Dilution

In addressing the issue of actual dilution, the parties once more turned to their respective experts. This time, Dr. Jacoby battled Dr. Yoram "Jerry" Wind, a Ph.D. in Marketing.[192] Not surprisingly, the two reports reach opposite conclusions and neither is persuasive on the issue of actual dilution.

#### a. Jacoby Dilution Study

The objective of Dr. Jacoby's dilution study is to test Louis Vuitton's belief that Dooney & Bourke's "use of a monogram with multiple bright colors in a repeating pattern similar to the Louis Vuitton Multicolore design would cause dilution," de-

---

**189.** *See* 8/27/03 E–Mail to Dooney & Bourke, D & B 00001941 ("Do you know I almost bought a Louis V bag because I have been wanting that 'look'!! . . . [Y]ou almost lost me to them."); 10/03 E–Mail to Dooney & Bourke, D & B 00001979 ("i have the louis vuitton multicolor bag in white . . . your new bags are way better, especially with the attention to details . . . . like the multicolor zipper"); 9/2/03 E–Mail to Dooney & Bourke, D & B 00002004 ("Yah!!!!!! I can't wait to get [an It–Bag]. I have been wanting a faux Louis Vuitton one until I saw the It bag."); 11/15/03 E–Mail to Dooney & Bourke, D & B 00002048 ("I just bought ithe [sic] 'It Bucket Bag'. . . . I LOVE LOVE LOVE your new design. Please continue to give the overpriced and overrated Louis Vuitton a run for their money."); 12/2/03 E–Mail to Dooney & Bourke, D & B 00001940 ("I bought the new 'IT' purse exactly two weeks ago. I was so excited about it because i have been looking for a knockoff of the louis vuitton with the multicolor logos."); 2/12/04 E–Mail to Dooney & Bourke, D & B 00001463–64 ("I had debated between your bags and the Louis Vuitton version—the original—but I liked some of the details in your bags more."), Ex. L to LeGrand Aff.

**190.** As a matter of logic, because Dooney & Bourke has sold close to 900,000 total units of It Collection products, *see* Monthly Sales of "It" products (in units) by Type of Product, six e-mail messages purportedly showing actual dilution carries little, if any, weight. Moreover, given the resources dedicated to the prosecution of this action, Louis Vuitton's inability to identify additional e-mail messages or other evidence of dilution is striking. *See* Tr. at 121 (Barbault) (testifying that he had searched in vain through Louis Vuitton documents, including e-mails to Louis Vuitton from its customers, for evidence of either confusion or dilution). On the other hand, I recognize that proving actual dilution is difficult. As one author quipped, "a customer rarely calls a trademark owner and says, 'I think the capacity of your mark to identify and distinguish your products is being lessened by Company B's use of your mark.' It does not happen very often in the real world." William G. Barber, *How to Do a Trademark Dilution Survey (or Perhaps How Not to Do One),* 89 Trademark Rep. 616, 616 (1999).

**191.** *See Moseley,* 537 U.S. at 433, 123 S.Ct. 1115.

**192.** *See* July 1, 2004 Expert Report of Yoram Wind, Ph.D., on Dilution ("Wind Dilution Study"), Ex. A to Wind Aff.

fined as "either a lessening of the purchase intentions toward and/or perceived distinctiveness, exclusivity, value and desirability of the Louis Vuitton Multicolore bags, or an increase in purchase intentions toward the Dooney It–Bags".[193] Based on the answers of ninety-six respondents, Dr. Jacoby found that Dooney & Bourke's It-bags "cause dilution by blurring at [twenty-three] percent and that the Dooney lookalikes had a tendency to decrease the distinctiveness, value and exclusivity of the Monogram Multicolore." [194]

This finding merits little weight for several reasons. *First,* screening questions used in this study rely on respondents' understanding of the ambiguous word "purse," which, for the reasons stated in Part III.B.2.d.i.1, results in a potentially overinclusive universe.[195] *Second,* the study lacks objectivity. Having failed to obtain satisfactory responses (*i.e.,* no dilution) from his first fifty-eight respondents, Dr. Jacoby terminated the original survey and started over with a new pool of fewer than one hundred respondents, but used substantially the same questions.[196] *Third,* Dr. Jacoby expanded the scope of "dilution" (by blurring) under the FTDA beyond "distinctiveness," "exclusivity," and "value," by asking questions relating to "desirability." [197] When a respondent indicated that the presence of the It–Bags in the market diminished the *desirability* of the Louis Vuitton Monogram Multicolore handbags, Dr. Jacoby counted her as "diluted." [198] Because desirability is unre-

---

**193.** Jacoby Dilution Study at 3.

**194.** Reply Mem. at 21; *see also* Jacoby Dilution Study at 4–5. This study yields a "net dilution" number, *i.e.,* the difference between the level of dilution observed with the Dooney & Bourke test bag and the average level of dilution obtained using the control bags (the so-called noise).

**195.** *See* Jacoby Dilution Study at 4.

**196.** Prior to completing his dilution study, Dr. Jacoby ran a "pilot" survey. *See* Draft Results of LV Pilot (2/9/04); Main Questionnaire, Def. Ex. 615. The findings of this initial study were not reported in the Jacoby Dilution Study and revealed little to no net dilution. Dr. Jacoby discarded these results on account of what he called interviewee "fatigue" and rewrote some of the questions to "focus" respondents' attention. Tr. at 305. It *is* legitimate to run a pilot study for purposes of improving a study. But in this case the circumstances hint at a darker purpose. Louis Vuitton has produced no evidence of interviewee fatigue. Moreover, the revisions made to the questions were relatively minor (*e.g.,* the insertion of the words "also" or "appearance of") or leading (*e.g.,* the addition of the words "in this pattern" to question 7A). *Compare* Def. Ex. 615, *with* Def. Ex. 645; *see also* Tr. at 321 (Jacoby). Finally, Dr. Jacoby never disclosed in his dilution study that he

had terminated the previous study. *See* Tr. at 322 (Jacoby).

**197.** Desirability (and possibly "value") relates to only dilution by *tarnishment.* However, as noted in Part II.D.2, the statutory language of the FTDA suggests that dilution by tarnishment is not actionable under federal law. Moreover, conflating survey results derived from two different types of dilution (blurring and tarnishment), to calculate a net "dilution" figure is misleading.

**198.** *See* Tr. at 340–41 (Jacoby). Additionally, there were some coding decisions that suggest a misunderstanding of "dilution." For example, when told, "I would like you to suppose you actually owned one or both of the [Louis Vuitton] bags I am handing to you. If you actually owned one or both of these bags, how would knowing that the [two Dooney & Bourke] wristlets were also being sold in the multicolored pattern on both white and black make you feel?," one respondent answered, "It would make me want to buy these [Dooney & Bourke wristlets]. They are more my style. I like the pattern better." Verbatim Transcription at 15, App. I to Jacoby Dilution Study, (Respondent # 1111). Dr. Jacoby counted this as a diluted response because the respondent uttered the words "pattern." *See* Respondent Classification, App. J to Jacoby Dilution Study, Def. Ex. 654, at 1 (coding # 1111 as diluted); Tr. at 366 (Jacoby). To

lated to a mark's ability to identify and distinguish Louis Vuitton's handbags, inclusion of these questions was erroneous.[199] For the foregoing reasons, the Jacoby Dilution Study lends little, if any, support to the assertion that the Dooney & Bourke It multicolored bags actually dilute the Monogram Multicolore trademarks.

### b. Wind Dilution Study

As with the dueling confusion studies, because the burden rests with Louis Vuitton to show that it is entitled it to a preliminary injunction, Dooney & Bourke's expert report warrants only brief discussion. Suffice it to say that at great expense Dr. Wind conducted his own study that purported to demonstrate the absence of dilution. But his report lacks probative value. Although a veteran in the area of market positioning studies, Dr. Wind lacks particular experience with dilution surveys.[200] Indeed, the methodology he used—i.e., placing Louis Vuitton's Monogram Multicolore handbags in a vast array of other companies' multicolored handbags[201]—although commonplace in positioning studies, has never been accepted or endorsed by *any* court in the context of trademark dilution.[202] Lack of judicial enthusiasm for this technique is not surprising. The presence of so many *other* multicolor-monogrammed bags likely distracts respondents from the central issue—whether the It–Bag monogram diminishes the ability of the Monogram Multicolore marks to identify the Louis Vuitton bags. Upon close inspection, the Wind Dilution Study reveals little except that there is high consumer recognition of the Louis Vuitton Monogram Multicolore marks.[203]

the contrary, this answer does *not* reflect "dilution" because it says nothing about whether It–Bags diminish the capacity of the Monogram Multicolore *trademarks* to identify Louis Vuitton as the source of its bags. *See also, e.g.*, Verbatim Transcription at 13 (# 1110) (answering question—"I would like you to suppose you actually owned one or both of these [Louis Vuitton] bags. If you actually owned one or both, how would knowing [these Dooney & Bourke bags were] being sold make you feel?"—respondent said, "I'm not big on the multi-color pattern but I do like the wrist bag." When probed further, the interviewee added, "I like the little heart."); Respondent Classification at 1 (categorizing # 1110 as diluted because she mentioned "multi-color pattern"); *see also* Tr. at 362 (Jacoby).

**199.** Even assuming, *arguendo*, that "desirability" is relevant to dilution, Dr. Jacoby's method of tabulating the responses is suspect. In particular, he counted a respondent as "diluted" if she provided *one* answer evincing dilution, even if all of her other answers suggested a *positive* influence of the Dooney & Bourke bags on the perception of the Louis Vuitton bags. *See* Jacoby Dilution Study at 23.

Additionally, Dr. Jacoby incorrectly claims that the net dilution figure represents the percentage of respondents that "provided an answer indicating ... dilution, and *gave as the reason for their answer one or more elements of a monogram with multiple bright colors in a repeating pattern.*" Jacoby Dilution Study at 25 (emphasis added). As Dooney & Bourke points out, "[f]our of Jacoby's questions—concerning effect on distinctiveness, value, exclusivity and desirability—did not even permit respondents to provide the reason for their answer." Def. Opp. at 32; *see also* Main Questionnaire, App. F to Jacoby Dilution Study, at 5–6.

**200.** *See id.* at 546–47 (Wind).

**201.** Moreover, these bags were apparently selected by Dooney & Bourke's counsel, not Dr. Wind. *See* Tr. at 592–94 (Wind); E–Mail Message from Roger Brooks, counsel for Dooney & Bourke to Dr. Wind, Pl.Ex. 136.

**202.** *See* Tr. at 612–13 (Wind); *see also* Wind Dilution Report at 3 (describing methodology).

**203.** *See* Wind Dilution Study at 13 (85% of respondents identifying trademark).

### c. Summary of Dilution Evidence

Considering the consumer e-mails purportedly evincing "dilution" by blurring, and discounting the Jacoby Dilution Survey, Louis Vuitton has not made an adequate showing of dilution for purposes of this motion. There is an absence of convincing evidence of any "lessening of the capacity of [plaintiff's mark] to identify and distinguish [its] goods or services."[204]

### 3. Requirements for Preliminary Injunction

Even assuming, *arguendo*, that Louis Vuitton had adequately demonstrated a strong likelihood of success on the merits of its federal dilution claim, plaintiff is not "presumptively entitled to a preliminary injunction."[205] Where there is no imminent threat of rapid dilution, the extraordinary relief of granting a preliminary injunction is not warranted. Moreover, Louis Vuitton's delay in bringing this lawsuit suggests that, in the absence of immediate injunctive relief, irreparable harm is unlikely.

### D. State Law Claims

### 1. Trademark Infringement and Unfair Competition

As discussed in Part III.C, Louis Vuit-

ton has not shown a likelihood of consumer confusion between its products and the Dooney & Bourke It–Bags for purposes of the Lanham Act. Accordingly, it cannot demonstrate that it is entitled to a preliminary injunction under New York law, which requires proof of a likelihood of confusion, as in a Lanham Act claim.[206]

### 2. Trademark Dilution

■ Louis Vuitton has not met its burden of showing a "likelihood of dilution," necessary for immediate equitable relief under state anti-dilution laws.[207] *First,* Louis Vuitton has not demonstrated a likelihood of dilution by blurring, as measured under a six-factor framework.[208] Most of the factors strongly suggest that blurring is unlikely to occur. Specifically, Louis Vuitton has not shown that the marks are substantially similar, reducing the ability of the Monogram Multicolore marks to serve as a unique identifier for Louis Vuitton handbags and related accessories.[209] Moreover, the relative sophistication of consumers and lack of predatory intent counsels against the likelihood of blurring. The remaining factors favor Louis Vuitton: the two marks are in competitive proximity and both marks are renowned.[210] How-

---

**204.** *Moseley,* 537 U.S. at 434, 123 S.Ct. 1115.

**205.** *Federal Express,* 201 F.3d at 178.

**206.** *See supra* Part II.D.1.

**207.** *See Scholastic,* 124 F.Supp.2d at 848.

**208.** *See supra* note 111 and accompanying text.

**209.** Notably, to prevail on a dilution claim, a plaintiff must make a very strong showing of substantial similarity. *See Mead Data Ctr., Inc. v. Toyota Motor Sales,* 875 F.2d 1026, 1028–29 (2d Cir.1989).

**210.** The record suggests that the Dooney & Bourke monogram is well known. Dooney & Bourke is not a newcomer to the fashion

world, having been selling handbags for over twenty-five years, *see* Tr. at 640 (Dooney), its bags are regularly counterfeited, *see* Def. Exs. 1200–04 (knock-off bags featuring "DD," "BB," and "DP" logos), and its key fob (the pink heart charm with "Dooney & Bourke" written in gold) has been a successful item on the market, suggesting consumer recognition of the name, *see* Monthly Sales of "It" products (in units) by Type of Product. *See also* Tr. at 649 (Dooney); Mischa Barton It–Bag Ads, Def. Ex. 117. Ordinarily, renown of the junior user's mark weighs in the senior user's favor, under the theory that the junior mark might "overwhelm" the senior mark. *See Mead Data Ctr.,* 875 F.2d at 1038. But where, as here, the marks are not substantially similar, let alone identical, the concept of a "junior user" makes little sense and lacks relevance to the issue of dilution by blurring.

ever, balancing these factors, it is quite clear that Louis Vuitton has not yet shown that it is likely to succeed on the merits of a state dilution claim premised on blurring.

*Second,* Louis Vuitton has not shown that Dooney & Bourke's use of its multicolored initials "tarnish" the Monogram Multicolore marks. "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." [211] Louis Vuitton has not demonstrated that Dooney & Bourke's products are either presented in an unwholesome way or of such a shoddy quality that Louis Vuitton's marks are likely to be harmed by any mental association consumers might have between the two products.

### 3. Requirements for Preliminary Injunction

Because Louis Vuitton has not demonstrated that a likelihood of dilution exists, there is no presumption of irreparable harm. As I have already noted Louis Vuitton has shown neither that it will suffer irreparable harm in the absence of a preliminary injunction, nor that the balance of the hardships tips in its favor.

## IV. CONCLUSION

For the foregoing reasons, Louis Vuitton's motion for a preliminary injunction is denied in its entirety. The Clerk of the Court is directed to close this motion. A conference is scheduled in Courtroom 15C for September 13, 2004, at 4:30 p.m.

SO ORDERED.

**211.** *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 507 (2d Cir.1996) (quotation marks and citation omitted).